**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF MISSOURI**
**EASTERN DIVISION**

| | | | |
|---|---|---|---|
| UNITED STATES OF AMERICA, | ) | | |
| | ) | | |
| Plaintiff, | ) | | |
| | ) | | |
| v. | ) | No. | 4:12-CR-369-JCH-NAB-1 |
| | ) | | |
| REGINALD BERNARD WILLIAMS, | ) | | |
| | ) | | |
| Defendant. | ) | | |

## REPORT AND RECOMMENDATION

The above matter was referred to the undersigned United States Magistrate Judge pursuant to 28 U.S.C. § 636(b).  The defendant Reginald Bernard Williams was charged with knowingly transporting a minor in interstate commerce with the intent for the minor to engage in prostitution.  On April 5, 2013, Williams filed a Motion to Suppress Evidence and Motion to Suppress Statements [Docs. 45, 46].  On April 12, 2013, the United States of America ("the Government") filed its Response to the motions to suppress evidence and statements.  [Doc. 51].  The undersigned conducted a hearing on this matter on April 19, 2013.  Additional briefing was filed following the hearing.  [Docs. 61, 62].  The undersigned will make the following findings of fact and conclusions of law with regard to the motions to suppress evidence and statements based upon the evidence adduced at the hearing, as well a review of the transcript of the hearing, the video recordings of the interrogation, and briefs of the parties.

## FINDINGS OF FACT

The undersigned heard testimony from Mark Krug, a Collinsville Police Department detective and a task force officer with the FBI.  Detective Krug has been working with the Collinsville Police Department for approximately 12 and a half years and the FBI task force for

approximately six and a half years.  As an FBI task force officer, Krug investigates child exploitation and sex trafficking cases.  He testified that he is familiar with tactics used by pimps and traffickers to avoid detection.  Those tactics include the use of online advertising.

In September 2012, he was involved with the investigation of a runaway minor female possibly involved in online prostitution through backpage.com.  Krug testified that online advertising is commonly used in sex trafficking, including advertisements involving minors on backpage.com.  The minor's grandmother had provided the department with a screen shot of a backpage.com ad that had a picture of her granddaughter.  Krug testified that the investigation eventually resulted in the arrest of the defendant, Reginald Williams, in Hazelwood, Missouri at the Days Inn.

Krug learned of the potential prostitution through an interview with the victim's grandmother on September 12, 2012.  After receiving the backpages.com ad, he contacted the Child Advocacy Center and scheduled an emergency interview for the granddaughter.  When the girl failed to show up for the interview, Krug attempted to locate the granddaughter through the number that her grandmother used to contact her.  The number belonged to another minor female.  Krug eventually determined that the minor victim was possibly located at a hotel in Hazelwood, Missouri.  He knew both girls were together because he was able to speak with the granddaughter through the other juvenile's phone.  Krug went straight from the Child Advocacy Center to the hotel.  While en route, he contacted the FBI in St. Louis and he asked one of his co-workers to alert the Hazelwood Police Department to meet him at the hotel.  Krug set up surveillance of the two hotel entrances when he arrived and met with three Hazelwood detectives.  One of the detectives set up surveillance of the hotel and the other two went to the room.  Krug testified that when Williams left the room the word was given to take him down and

Krug handcuffed him. He also testified that he briefly spoke with Williams telling him to calm down, everything would be fine, and that they would talk later to explain what was going on. He then patted Williams down for weapons.

Ryan Counterman has been a detective with the City of Hazelwood in Missouri for more than nine years. He testified he was working on or about September 13, 2012, and was notified about a missing juvenile staying at a Days Inn. After he received the information he showed up at the hotel and made contact with Detective Goldman, a detective with the Hazelwood Police Department. He also went to the front desk, identified himself as a police officer, and gave a description of the man and two women he was seeking. The desk clerk responded that they had just changed rooms and supplied the detective with the correct room number. Counterman then moved his undercover vehicle to a location that allowed him to conduct surveillance on the room. Counterman testified that he saw one individual leaving the room and identified him as Williams. He then saw the Williams leave, drive to McDonalds, return, and re-enter the room. Counterman did not participate in Williams' arrest.

The undersigned also heard testimony from Edward Roediger, a St. Louis County Police Department detective. Roediger has been a detective for approximately 21 years. Roediger is also a task officer with the FBI. He testified that a supervisor from his unit, four officers from his unit, three or four officers from Hazelwood Police Department, an FBI representative, and a Collinsville police officer participated in this investigation of underage prostitution. The officers made a plan that Detective Roediger would make a phone call to the backpage.com advertisement and book a date. Based on his experience, Roediger determined that the ad was a commercial sex offer involving a minor female. When he arrived on the scene he was wearing plain clothing, a listening device, and driving a white Ford pickup truck. At the hotel, Roediger

called the number but the call went unanswered. While calling, he noticed Williams come outside and walk around while making a phone call. Williams walked from the west side of the building east toward the front entrance but stopped behind Roediger's truck. Roediger relayed this information to his supervisor and his supervisor made the decision to take the defendant into custody. He testified that he responded directly to the room where Special Agent Nikki Badolato and her supervisor were already present. The door was open and they entered the room and identified two young girls inside. The girls agreed to have the room searched and observed the officers while they performed the search. The search resulted in the seizure of a cell phone and condoms, and Roediger was aware that other officers were searching the vehicle.

Roediger testified that he was familiar with the items marked as Government's Exhibit 3, which are seven search warrants requested on October 19, 2012 for the items that were seized on the day of the search. The exhibit was entered into evidence without objection. The items included cellular telephones and a book bag obtained from the trunk of the rental vehicle that contained a laptop computer and a loaded .38 caliber handgun. There was also a digital camera, an external hard drive, and numerous condoms. The items that needed to be forensically searched, pursuant to the warrants, were the two cell phones, laptop, hard drive, digital camera, memory card, and miscellaneous DVD and CDs. These items were searched and a report was generated.

On cross examination, Roediger stated that he did not obtain Williams' consent to search any of the items that were seized. He also states that the hotel room was registered to Williams but he did not get consent from him to search the room. Additionally, as the case agent he was in charge of seizing, handling, maintaining, and keeping track of all the evidence seized.

On redirect examination, Roediger testified that while he did not obtain consent from Williams to search his items, he was aware that another St. Louis County detective did obtain consent to search the vehicle. He also stated that Williams was not present when the room was searched.

Michael Slaughter is a detective with the St. Louis County Police Department and has held that position for three years. He is also a task force officer with the FBI. Slaughter testified that he was an assisting detective during the activities of September 13, 2012. He stated that he arrived right before Williams was arrested. Slaughter testified that he got out of his vehicle and approached Williams who, at the time, was already being apprehended by members of the arrest team. He then announced that he was a police officer and displayed his firearm. Slaughter observed Williams run briefly and then comply with the request of the other officers; he then secured his firearm and returned to his vehicle making no physical contact with Williams.

Slaughter testified that after about 15 minutes, he left his vehicle and removed Williams from the backseat of a patrol vehicle. He exchanged the cuffs on the Williams' hands for his own and walked Williams to his vehicle and sat him in the front seat. He stated that he explained to Williams that there were charges against him for promoting prostitution and he read him his Miranda rights from a St. Louis County Waiver and Warning form. He testified that he keeps copies of the form with him. Slaughter did not have the defendant sign the form, but he stated Williams agreed to speak to him without promise or threat. Williams told him that his vehicle was a rental and that he had a registered firearm in the vehicle. Williams also told Slaughter that they could search his vehicle. Slaughter testified that Williams never asked for the search to stop.

5

Slaughter briefly frisked Williams at the scene for officer safety and then transported him to St. Louis County headquarters where he removed his shoelaces and wallet. At the station, Slaughter put Williams in an interview room and had a brief conversation with him before the recording began. He and FBI Special Agent Nikki Badolato conducted the interview. Slaughter reminded Williams that he had read him his Miranda rights earlier and Williams acknowledged it. Government's Exhibit 2, the video and audiotape of the interview, was admitted into evidence without objection. Williams asked to stop the interview after about 5 hours when he asserted his right to obtain a lawyer. The Government's Exhibit 1, the towing and inventory manual, was admitted into evidence without objection.

On cross examination, Slaughter testified that during the interview he was given information from searches done on the telephones and the computer. Additionally, it was when the detective presented the defendant with a consent form for the electronic search that he requested a lawyer. Defendant's Exhibit A, the form, is admitted into evidence without objection.[1]

Nikki Badolato has been a special agent with the FBI for 11 years. She testified that she was part of the surveillance team during the September 13, 2012 investigation. After the defendant was taken into custody, she assisted Slaughter with the interview and was present when Williams re-affirmed a reference to his Miranda warnings. She testified that Williams did not state that he wanted to speak with an attorney while she was present in the interview room. During the interview she made reference to the fact that she was a federal law enforcement officer and that it was a violation of statute to lie to one. She also said she did not speak to Williams prior to the interview being recorded.

---

[1] St. Louis County Police Department Waiver and Warning Form

The undersigned also heard testimony from Reginald Williams, the defendant. Williams recalls 11 to 14 officers approaching him when he was arrested. He testified that after he was handcuffed, the officers immediately began a search of his vehicle and told him that they were only detaining him. He stated that he was never asked permission to search his vehicle nor was he asked if there was a firearm in his car. He was able to watch the search but he claims he was never read his rights by Slaughter. Williams also testified that after his arrest, while he was in custody, and during the interview he was never presented with the form in Defendant's Exhibit A and that he never signed anything. Williams testified that he asked Slaughter for a phone call to an attorney or his father and the detective said he would have to give a statement first before getting a phone call or he would get more charges such as obstruction of justice. Williams testified his request for a phone call was made before he entered the investigation room and before the recording started. When Williams was presented with the consent form, he stated that he again reiterated that he wanted to see an attorney. He also testified that he would not have made a statement if he had not been told that it would be an obstruction of justice not to do so. During cross examination, the Williams testified that the arresting officer read him his rights but it was not Detective Slaughter.

## CONCLUSIONS OF LAW

Williams moves for suppression of evidence and statements because he claims (1) his interrogators questioned him without first obtaining a knowing, voluntary, and intelligent waiver of his Miranda rights and (2) his rental vehicle and belongings were searched without a search warrant in violation of the Fourth Amendment.

**A.      Waiver of Miranda Rights**

"[T]he prosecution may not use statements, whether exculpatory or inculpatory, stemming from custodial interrogation of the defendant unless it demonstrates use of procedural safeguards effective to secure the privilege against self-incrimination." *Miranda v. Arizona*, 384 U.S. 436, 444.  Prior to any questioning, the defendant must be warned of his right to remain silent, that any statement he may make can be used as evidence against him in a court of law, and that he has a right to the presence of an attorney, and if he cannot afford an attorney one will be appointed for him. *Id.* at 479.

**1.      Statements made by Williams**

The Supreme Court has stated that statements made by a custodial suspect in response to interrogation are inadmissible unless the suspect has voluntarily, knowingly, and intelligently waived his right against self-incrimination. *United States v. Binion,* 570 F. 3d 1034, 1040 (8th Cir. 2009).  "The test for determining the voluntariness of a confession is whether, in light of the totality of the circumstances, pressures exerted upon the suspect have overborne his will." *United States v. Hambrick*, 630 F.3d 742, 749 (8th Cir. 2011).  "The potential circumstances include police coercion, the length of the interrogation, its location, its continuity, the defendant's maturity, education, physical condition, and mental health, but also the failure of police to advise the defendant of his rights to remain silent and to have counsel present during custodial interrogation." *Id.*  The court determines whether the confession "was extracted by threats, violence, or ... promises, such that the defendant's will was overborne and his capacity for self-determination critically impaired." *United States v. Kilgore,* 58 F.3d 350, 353 (8th Cir.1995).

Williams contends that his statements should be suppressed, because even though he may have been read his *Miranda* rights at the time of the arrest, several hours passed before he was questioned and he was never presented nor signed an Advise of Rights form.

At the evidentiary hearing, Slaughter testified that soon after Williams' arrest, he read Williams his *Miranda* rights and asked if understood each right and that Williams indicated verbally that he understood. Slaughter also testified that he asked Williams if he wished to waive those rights and Williams again said yes. At the evidentiary hearing, Williams testified that the arresting officer, not Detective Slaughter, read him his rights. Williams also testified that he was intimidated by the look on Slaughter's face. In addition, he testified that he was scared and that at various times, he was told that he could be charged with obstruction of justice, statutory rape, and lying to a federal agent. Williams also testified that he asked for his father, a phone call, and a lawyer. Williams testified that he was "kind of familiar" with his rights. Williams testified that he did not sustain any injuries during his arrest.

During the video recording of his interrogation, Williams affirms that Slaughter read him his *Miranda* rights. Williams asks once to call his father. Williams also asked Slaughter and Badolato to call his father and stepmother to verify his whereabouts the previous two days and then later again asks if they had called his father. Williams also states during the interrogation that he "talks too much," "need[s] to stop talking," and that he was "nervous." The officers also mentioned that Williams could be charged with promoting prostitution and lying to a federal agent.

Based on the foregoing, the undersigned finds based on the totality of circumstances Williams was given his *Miranda* rights and made a knowing, voluntary, and intelligent waiver of those rights. The undersigned credits the testimony of Slaughter that he read Williams his

*Miranda* rights and did not use any threats against Williams in an attempt to elicit a confession. *See U.S. v. Vega*, 676 F.3d 708, 718 (8th Cir. 2012) (district court found officer credible and based on totality of circumstances, defendant's statement was voluntary). Williams affirmed during the video recording that Slaughter read him his *Miranda* rights. Regardless of whether Slaughter or the arresting officer gave Williams the *Miranda* warning, Williams admits that someone told him of his rights and that he was familiar with those rights. During the interrogation, Williams was given several breaks, allowed to use the bathroom, and given food and drinks. Williams was not threatened by the officers. The police officers' conduct was not calculated to overbear his will. The officers' alleged statements that Williams could be charged with obstruction of justice, statutory rape, promoting prostitution, and lying to a federal officer were possible charges based on the officers' investigation into underage prostitution. *See U.S. v. Gallardo-Marquez*, 253 F.3d 1121, 1123 (8th Cir. 2001) (statements that defendant could receive life in prison were not calculated to force him to confess, but accurate representation of his predicament). Further, the Court finds that the officers in this case did not need to repeat the *Miranda* warning in full each time the interrogation process was resumed after an interruption. *Miller v. U.S.*, 396 F.2d 492, 496 (8th Cir. 1968), *cert. denied*, 393 U.S. 1031 (1969). Finally, a written waiver of *Miranda* rights is not required. "A voluntary waiver need not assume any particular form; it may be made in writing on a printed format or it may be made orally by replying to questions as in this case." *U.S. v. Mears*, 614 F.2d 1175, 1178 (8th Cir. 1980). Therefore, the undersigned finds that based on the totality of circumstances, Williams made a knowing, voluntary, and intelligent waiver of his *Miranda* rights and his statements to officers after waiving those rights should not be suppressed.

### 2. Request for Counsel

"[A]fter a person in custody has expressed his desire to deal with the police only through counsel, he is not subject to further interrogation by the authorities until counsel has been made available to him, unless the accused himself initiates further communication, exchanges, or conversations with the police." *Arizona v. Roberson*, 486 U.S. 675, 682 (1988) (citing *Edwards v. Arizona*, 451 U.S. 477, 484-85 (1981)). The purpose of this rule is to prevent police from badgering a defendant into waiving his previously asserted *Miranda* rights. *Holman v. Kemna*, 212 F.3d 413, 417 (8th Cir. 2000). The burden of proving that a defendant has knowingly and voluntarily waived his right to counsel present at an interrogation rests with the government. *Id.* at 420.

At the evidentiary hearing, Williams testified that at the time of his arrest and just prior to being placed in the interview room, he asked Slaughter could he "get a phone call for an attorney" or call his father so he can have an attorney sent for him. Williams testified that Slaughter responded that Williams had to make a statement before he could make a phone call or Williams would get more charges for obstruction of justice. Williams also testified that he told Slaughter that he did not want to talk to him and that he wanted a lawyer before the start of the video recording. Williams admitted on cross-examination that during five hours of video recording, he did not request an attorney until just before the video recording concluded. At the evidentiary hearing, Slaughter testified that Williams never asked him for a lawyer and he was not aware of Williams asking anyone else for a lawyer. He also testified that he did not pressure Williams about anything or make any promises during the interview. During the video

11

recording, Williams asks to call his father or for the officers to contact his father to verify his whereabouts. Williams asked for an attorney just prior to the conclusion of the video recording.

The undersigned credits the testimony of Slaughter that Williams did not ask for counsel until just before the conclusion of the video recording. Williams testified that he was given his *Miranda* rights. Williams admits that he was not threatened or physically injured. After Williams invoked his right to counsel, communication with the officers ended. Therefore, the undersigned finds that Williams knowingly and voluntarily waived his right to counsel to be present at his interrogation and any statements made after waiving his Miranda rights and before invoking his right to counsel should not be suppressed.

**B.    Search of Williams**

Williams states that the search of his person violated the Fourth Amendment, because there was no probable cause "of the commission of any cognizable felony" for his arrest. He asserts that the police must have "sufficient knowledge of the crime promoting/engaging in the acts of prostitution by minors and/or two counts of Sexual Trafficking of a Child, pursuant to the Missouri state statute." The Fourth Amendment to the United States Constitution protects the "right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures." U.S. Const. amend. IV. Therefore, a warrant is normally required to make an arrest or search a person or property. "Probable cause to make a warrantless arrest only exists when considering all of the circumstances, police have trustworthy information that would lead a prudent person to believe that the suspect has committed or is committing a crime." *U.S. v. Baldenegro-Valdez*, 703 F.3d 1117, 1125 (2013) (citing *U.S. v. Parish*, 606 F.3d 480, 486 (2010)). "To determine whether an officer had probable cause to arrest an individual, [the court examines] the events leading up to the arrest, and then decide[s] whether these

historical facts viewed from the standpoint of an objectively reasonable police officer, amount to probable cause." *Maryland v. Pringle*, 540 U.S. 366, 371 (2003).

Arresting officers are not required to witness actual criminal activity to justify a warrantless arrest. *U.S. v. Winarske*, __ F.3d __, 2013 WL 2157815 (8th Cir. May 21, 2013) (citing *United States v. Webster*, 625 F.3d 439, 442 (8th Cir. 2010)). "Because probable cause requires only a probability or substantial chance of criminal activity, the police need not have amassed enough evidence to justify a conviction prior to making a warrantless arrest." *U.S. v. Mendoza*, 421 F.3d 663, 667 (8th Cir. 2005) (internal citations omitted). "Law enforcement officers have substantial latitude in interpreting and drawing inferences from factual circumstances." *U.S. v. Henderson*, 613 F.3d 1177, 1181 (8th Cir. 2010). The police "possess specialized law enforcement experience and thus may draw reasonable inferences of criminal activity from circumstances the general public may find innocuous." *Mendoza*, 421 F.3d at 667.

The police were conducting an investigation of a possible runaway involved in online prostitution and advertising on backpage.com. The officers had extensive experience investigating online prostitution and child trafficking cases. The police investigation led them to the hotel room registered to the defendant. The officers then set up a sting operation at the hotel. The hotel clerk had informed the police that people matching the descriptions provided by the police had just changed rooms at the hotel. Williams was seen by officers entering and exiting the hotel room identified by the hotel clerk. The undersigned finds that based on the totality of circumstances, the police had probable cause to arrest Williams.

"A search incident to arrest may lawfully extend to the arrestee's person and the area within his immediate control. . . ." *U.S. v. Allen*, 713 F.3d 382, 386 (8th Cir. 2013) (citing *Chimel v. California*, 395 U.S. 752, 763 (1969)(abrogated in part by *Arizona v. Gant*, 556 U.S.

332, 335 (2009)).  Because the police had probable cause to arrest Williams and the search of his person incident to his arrest is lawful, the undersigned finds that the search of Williams's person was reasonable.

## C.    Searches of Property

Next, Williams asserts that the warrantless search of his personal effects, his rental vehicle and his belongings were in violation of the Fourth Amendment.  Williams contends that the officers did not have his consent to search any of those items.  To determine whether a consent to search is voluntary, the court must examine the totality of circumstances.  *U.S. v. Johnson*, 619 F.3d 910, 918 (8th Cir. 2010).  The court should consider (1) the defendant's age; (2) general intelligence and education; (3) whether he was intoxicated at the time; (4) whether he was informed of his Miranda rights before consenting; (5) whether any previous arrests would have informed him of his rights and protections; (6) the length of time he was detained; (7) whether the officers acted in a threatening manner; (8) whether the police made any promises or misrepresentations; (9) whether the defendant was in custody or under arrest at the time; (10) whether he consented in public; and (11) whether he was silent during the search.  *Johnson*, 619 F.3d at 918.

At the evidentiary hearing, Slaughter testified that Williams pointed out his vehicle and asked if it was going to be towed and whether he could he get some belongings out of it. Slaughter testified that he then asked Williams if he had anything illegal in the vehicle and Williams responded that he had a registered firearm in the vehicle.  Williams also gave verbal consent to search the vehicle.  Slaughter then told Sergeant Kavanaugh that Williams had given verbal consent for a search.  Slaughter testified that Williams was present during the search of the vehicle and Williams did not state he wanted the search to end.  At the evidentiary hearing,

Williams testified that he did not give the police consent to search the car and that the officers just took the keys from around his neck, unlocked the car door, popped the trunk, and started searching. During the video recording of Williams's interrogation he gives verbal consent to Slaughter to search the Toshiba laptop, hard drive, external hard drive, flash drive, SD card, memory card, and camera.

### 1. Search of Vehicle

The undersigned finds that based on the totality of circumstances Williams gave valid consent to search the vehicle. Williams admits that he was informed of his Miranda rights and was under arrest and present at the time of the search. There is no evidence that Williams was intoxicated or that the police made any promises, misrepresentations, or threats to him to obtain permission to search the vehicle. There is no evidence that Williams objected to the search during the time that it occurred. At the evidentiary hearing, Williams testified that the search of the vehicle was complete when he left with Slaughter and that he saw the tow truck take it away.

In addition, the officers' search of the vehicle was valid as an inventory search. There is an inventory exception to the Fourth Amendment's warrant requirement, which "permits law enforcement to inventory the contents of a vehicle that is lawfully taken into custody even without a warrant or probable cause to search." *U.S. v. Garreau*, 658 F.3d 854, 857 (8th Cir. 2011). "An inventory generally serves three purposes: "the protection of the vehicle owner's property while it remains in police custody; the protection of the police against claims or disputes over lost or stolen property; and the protection of the police from potential danger. *Garreau*, 658 F.3d at 857. "Automobiles are frequently taken into police custody in the interests of public safety and community caretaking functions. [When] vehicles are impounded, local police departments generally follow a routine practice of securing and inventorying the

automobiles' contents." *U.S. v. Arrocha*, 713 F.3d 1159, 1162 (8th Cir. 2013). When properly

implemented, such actions do not run afoul of the Fourth Amendment's search warrant

requirement." *Id.* "The central question in evaluating the propriety of an inventory search, is

whether in the totality of circumstances, the search was reasonable."

At the evidentiary hearing, the Government entered into evidence the St. Louis County

Police Department's Towing and Inventory Manual[2] that governs inventory searches. The

inventory policy provides that officers may place a hold on a vehicle if the vehicle is involved in

a criminal investigation, required for criminal prosecution, or upon the request of another law

enforcement agency. Officers are required to thoroughly inventory and record the contents of

any motor vehicle towed and impounded by the Department. The inventory shall include

(1) areas that are readily accessible without using force; (2) areas where a person would be

expected to store or inadvertently leave belongings, and (3) any containers within the vehicle

when the contents of the container cannot be ascertained from examining the exterior of the

container. All seized items and their locations are to be listed on the Crime Inquiry and

Inspection Report/Authorization to Tow form and in the police report.

During the evidentiary hearing, Slaughter testified that the search was conducted in

accordance with the inventory search policy of St. Louis County. Williams has not alleged or

presented any evidence to dispute Slaughter's testimony that the removal of items from his rental

vehicle was reasonable or comported with the police department's inventory policy. Therefore,

the undersigned finds that under the totality of circumstances, Williams gave valid consent to

---

[2] The undersigned notes that St. Louis County Police Department's Towing and Inventory Manual that was entered into evidence at the evidentiary hearing as Exhibit 1 has the word "vehicle" redacted. The undersigned is not aware of any reasons why the word vehicle is redacted, but takes judicial notice of the word vehicle where it is included in the original version of the manual.

search the rental vehicle and in addition, the removal of items from the rental vehicle complied with the police department's inventory policy and was reasonable.

### 2. Search of Digital Items

Williams asserts that the government's search of his "effects" without a warrant violates the Fourth Amendment. There were two searches of digital items. First, the police did a forensic search of certain items after Williams consented. Second, on October 19, 2012, the police obtained search warrants for the following specific items: (1) black Boost Mobile Sanyo cellular telephone ("Phone A"), (2) black Traveler digital camera, (3) black Boost Mobile Samsung cellular phone ("Phone B"), (4) black Toshiba laptop computer, (5) Hitachi external hard-drive, (6) blue and red Walgreens memory card 4.0 gigabytes, and (7) forty-seven DVD's and CD-ROM disks.

The undersigned notes that Williams does not identify which of the items seized by the government should be suppressed. Moreover, Williams does not contend that there was a lack of probable cause to support the issuance of the search warrants. Therefore, the undersigned will only address whether the search of certain items by the Government before the search warrants were issued was valid.

In the video recording of the interrogation, Williams gives verbal consent to search the Toshiba laptop, hard drive, external hard drive, flash drive, SD card, memory card, and camera found in the trunk of the vehicle. At the end of the video recording, Slaughter requests that Williams sign a written consent form to search the items found, but Williams refuses to sign it and then invokes his right to counsel. At the evidentiary hearing, Slaughter testified that a search of William's electronic equipment was conducted by another officer during the interrogation based on Williams' consent. At the evidentiary hearing, however, the Government did not

17

present any testimony from the officer who conducted the searches before the warrants were issued.

Based on Williams' verbal consent to search the Toshiba laptop, hard drive, external hard drive, flash drive, SD card, memory card, and camera, and the totality of circumstances, the undersigned finds that the consent for the search of those items was valid and that evidence should not be suppressed.

### 3. Search of Hotel Room

Finally, at the evidentiary hearing, Roediger testified that police seized condoms and a cell phone from the room registered to Williams at the hotel. He also testified that the minors B.D. and J.M. both agreed to allow the police to search the room. The police did not have a search warrant or consent from Williams to enter the room. The Government contends that exigent circumstances required warrantless entry into the room.

"Individuals have a reasonable expectation of privacy in their hotel room." *U.S. v. Williams*, 521 F.3d 902, 906 (2008). "Consensual searches do not violate the Fourth Amendment because it is no doubt reasonable for the police to conduct a search once they have been permitted to do so." *Id.* "In order for a consensual search to be valid, consent must actually be given (either express or implied), and the person giving consent must have (actual or apparent) authority to do so." *Id.* "Consent may be gained from a third party who possesses common authority over the premises to be searched." *Id.* at 907.

"Even a non-consensual warrantless search can be justified by exigent circumstances. *Williams*, 521 F.3d at 908. "Exigent circumstances are present where lives are threatened, a suspect's escape is imminent, or evidence is about to be destroyed." *Id.* The court must look

18

objectively at what a reasonable police officer would believe and the situations of urgency cannot be created by police officers. *Id.*

In this case, the undersigned finds that exigent circumstances justified the warrantless entry into the hotel room. The police were conducting a sting operation in efforts to find a runaway who had appeared in commercial sex ads on backpage.com. At the evidentiary hearing, Roediger, posing as a customer, testified that after arriving at the hotel "the pimp" did not answer the phone and he suspected that there was surveillance on the parking lot by the "pimp" or "trafficker." Roediger testified that he advised his supervisor that someone fitting the description of the suspected pimp, *i.e.*, Williams, was standing behind his vehicle. The officers then decided to arrest Williams. It is clear that there was a risk of evidence being destroyed and the underage women could have been in danger. The officers knew that the women advertised were underage, they had been advertised for prostitution, and it appeared that the "pimp" did not answer, because he became suspicious. Therefore, the undersigned finds that there was "legitimate need for immediate action that could not brook the delay incident to obtaining a warrant" and the evidence obtained during the search should not be suppressed. *U.S. v. Leveringston*, 397 F.3d 1112, 1116 (8th Cir. 2005)(risk of evidence being destroyed, blood on the defendant's person and clothing, and noises in hotel suite justified warrantless entry by police).

## CONCLUSION

The undersigned concludes that Williams was advised of his Miranda rights and waived those rights. It will therefore be recommended that Williams' statements should not be suppressed. In addition, the undersigned concludes that the search of Williams, the hotel room, and rental vehicle and its contents were legal.

Accordingly,

19

**IT IS HEREBY RECOMMENDED** that Williams' Motion to Suppress Evidence should be denied. [Doc. 45]

**IT IS FURTHER RECOMMENDED** that Williams' Motion to Suppress Statements should be denied. [Doc. 46]

The parties are advised that they have fourteen (14) days in which to file written objections to this Report and Recommendation pursuant to 28 U.S.C. § 636(b)(1). Failure to timely file objections may result in a waiver of the right to appeal questions of fact.

Dated this 11th day of June, 2013.

    /s/ Nannette A. Baker
NANNETTE A. BAKER
UNITED STATES MAGISTRATE JUDGE